| | | |
|---|---|---|
| SAMPSON K. KYERE, JR., MD, PhD.<br>5134 Northern Fences Lane<br>Columbia, MD. 21044<br>        Plaintiff, | *<br><br>*<br>* | IN THE<br><br>CIRCUIT COURT<br>FOR |
| v. | * | BALTIMORE CITY |
| LifeBridge Health, Incorporated<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | *<br><br>* | Case No. _____ |
|     Serve on:<br>    Jason H. Weiner, Esq.<br>    General Counsel<br>    10090 Red Run Boulevard<br>    Owings Mills, MD. 21117 | *<br><br>*<br><br>* | |
| Daniel Durand, MD<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | *<br><br>* | |
|     Serve on:<br>    Daniel Durand, MD<br>    2616 Chestnut Woods Court<br>    Reisterstown, MD. 21136 | *<br><br>*<br><br>* | |
| Elizabeth Zadzielski, MD, MBA,<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | *<br><br>* | |
|     Serve on:<br>    Elizabeth Zadzielski, MD, MBA<br>    14309 Oak Meadow Road<br>    Baldwin, MD. 21013 | *<br><br>*<br><br>* | |
| Omar Zalatimo, MD, MPH<br>10090 Red Run Boulevard<br>Owings Mills, MD. 21117 | *<br><br>* | |
|     Serve on:<br>    Omar Zalatimo, MD, MPH<br>    906 Monaghan Court<br>    Lutherville, MD. 21093 | *<br><br>*<br><br>* | |
| Unknown Members of the Impaired<br>Practitioner Committee formed Under the | * | |

1

| | |
|---|---|
| Sinai Hospital Medical Staff Bylaws | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Plaintiff, Sampson K. Kyere, MD, PhD ("Dr. Kyere), by and through undersigned counsel, hereby sues LifeBridge Health, Incorporated ("LBH") for disability discrimination, retaliation, constructive discharge in violation of State Government Article § 20-606, as well as breach of employment contract medical staff bylaws, and Dr. Daniel Durand for tortious interference with contract and gross negligence, and Drs. Elizabeth Zadzielski and Omar Zalatimo for gross negligence. This is an action for declaratory and monetary relief to secure protection of and redress for the deprivation of rights guaranteed by state law.

## JURSDICTION AND VENUE

1. This action is brought pursuant to Md. Code Ann., State Gov't § 20-606.

2. This Court has jurisdiction over this action pursuant to Md. Code. Ann., Cts. & Jud. Procs. § 6-103, as Defendant, LBH, performs work and service in the state of Maryland.

3. This Court has jurisdiction over this action pursuant to Md. Code. Ann., Cts. & Jud. Procs. § 6-102 as Defendant, LBH, is organized under the laws of the state of Maryland and Defendants Drs. Durand, Zadzielski and Zalatimo are domiciled in the state of Maryland.

4. This Court has jurisdiction over this action pursuant to Md. Code. Ann., Cts. & Jud.Procs. § 6-103, as Defendants caused tortious injury within the state of Maryland.

5. Venue is proper pursuant to Md. Code. Ann., State Gov't § 20-1013(b) because the unlawful employment practice occurred in Baltimore City, Maryland.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES WITH RESPECT TO STATE GOVERNMENT ARTICLE CLAIMS AND CAUSES OF ACTION

6. Plaintiff filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), Baltimore Field Office on September 14, 2022.

7. On June 12, 2023, EEOC issued a Determination Letter finding that LifeBridge Health engaged in unlawful employment discrimination in violation of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008.

8. Pursuant to Md. Code. Ann., State Gov't § 20-1013(a), Plaintiff has exhausted his administrative obligations and may therefore bring this civil action.

2

## PARTIES

9. Plaintiff, Dr. Sampson Kwame Kyere, Jr., is an adult resident of Maryland.

10. Defendant LBH operates 5 acute medical care centers and nearly 150 locations throughout the region, including in Baltimore City, Maryland.

11. Plaintiff worked for Defendant from June 2016 to September 15, 2022, primarily at LBH's Sinai Hospital in Baltimore City, Maryland.

12. At all times relevant to this Complaint, Dr. Daniel Durand was an employee of LBH and the Chairman of the Department of Radiology. Dr. Durand was the immediate supervisor of Dr. Kyere.

13. At all relevant times relevant to this Complaint, Dr. Elizabeth Zadzielski was an employee of LBH and the Chair of the Impaired Practitioner Committee convened to evaluate Dr. Kyere's ability to provide safe patient care.

14. At all relevant times to this Complaint, Dr. Omar Zalatimo was an employee of LBH and President of the Sinai Hospital Medical Staff. As President of the Medical Staff, Dr. Zalatimo was a member of the Impaired Practitioner Committee convened to evaluate Dr. Kyere's ability to provide safe patient care.

15. At all times relevant to this Complaint, Plaintiff was an "employee" of LBH under Md. Code Ann., State Gov't § 20-601(c).

16. At all times relevant to this complaint, LBH was Plaintiff's "employer" under Md. Code Ann., State Gov't § 20-601(d).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17. Dr. Kyere filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), Baltimore Field Office on September 14, 2022.

18. After an investigation, EEOC issued a Determination Letter finding reasonable cause to believe that LBH had engaged in unlawful employment discrimination in violation of the Americans with Disabilities Act (hereinafter referred to as "ADA") by subjecting Dr. Kyere to prohibited medical examination inquiries based on his disability, retaliated against him for requesting a reasonable accommodation, and discriminated against him, which culminated in his constructive discharge from his position.

19. EEOC's attempts to conciliate the matter failed, and a Right to Sue letter was issued by EEOC on August 30, 2023.

20. Pursuant to Md. Code. Ann., State Gov't § 20-1013(a), Dr. Kyere has exhausted all administrative remedies and may therefore bring this civil action.

## FACTS COMMON TO ALL COUNTS

21. Dr. Kyere is an Interventional and Diagnostic Radiologist, board certified in both specialties by the American Board of Radiology.

22. An interventional radiologist is a physician who performs minimally invasive image guided procedures. A diagnostic radiologist interprets imaging studies for diagnosis and treatment of patients.

23. Dr. Kyere earned his Doctor of Medicine and Doctor of Philosophy (in biochemistry) from the University of Maryland School of Medicine. He completed his diagnostic radiology residency at the University of Maryland Medical Center. After residency, Dr. Kyere also completed his vascular and interventional radiology fellowship at Johns Hopkins Hospital.

24. Plaintiff began his employment with LBH in June 2016.

25. Prior to his constructive discharge in September 2022, Dr. Kyere was employed by LBH under an employment agreement effective June 1, 2021 and continuing through June 30, 2024.

26. Throughout Dr. Kyere's employment with LBH, he had a reputation of being a very competent and capable Interventional Radiologist, who was trusted and respected by hospital administration and referring physicians who routinely referred to him complex patient cases.

27. Throughout his employment with LBH, Dr. Kyere was also promoted to many positions, including Vice Chief of Radiology, Medical Director of Interventional Radiology, member of the Sinai Hospital Medical Executive Committee, and member of the Sinai Hospital Multi-Disciplinary Peer Review Committee, which he held at the time of his constructive discharge in September 2022.

28. On March 1, 2022, Dr. Kyere made a request to Dr. Durand for a reasonable accommodation of a modified work schedule of three days per week, in lieu of five days, on advice of his treating physician. At the time, Dr. Kyere was under the care of his treating physician for a health condition that impacted his gait.

29. Prior to March 1, 2022, LBH and Dr. Durand were aware of changes in Dr. Kyere's gait which had become apparent to Dr. Kyere's coworkers and other employees at LBH.

30. Prior to his request for a reasonable accommodation, Dr. Kyere had never denied changes in his gait. In October 2021, five months before he requested a reasonable accommodation, Dr. Kyere personally scheduled a meeting with Dr. Durand to explain to him that he had been experiencing lumbar spine pain which was affecting his gait and that he was working with treating physicians to obtain treatment for his condition.

4

31. Despite changes in his gait, Dr. Kyere performed hundreds of procedures and continued to work full time and provide call coverage during evenings and weekends until his modified schedule was granted.

32. After Dr. Kyere requested a reasonable accommodation of a modified work schedule, it became immediately apparent that Dr. Durand preferred Dr. Kyere take leave under the Family Medical Leave Act (FMLA) or use his PTO in lieu of obtaining a modified work schedule as an accommodation under state and federal law.

33. Despite Dr. Durand's preference, Dr. Kyere insisted his request was for a modified work schedule as a reasonable accommodation and further clarified that although he was seeking a modified work schedule of three days per week in lieu of five days per week, he would continue to provide call coverage, perform all his duties as Medical Director, including being available on off days for consults, case reviews, and any other tasks he could perform remotely from home during his days off.

34. After much back-and-forth spanning a month about how Dr. Kyere could obtain a modified work schedule as a reasonable accommodation, Dr. Kyere retained legal counsel.

35. On March 28, 2022, Dr. Kyere sent an email to Drs. Durand and Alexander and informed them that the website to which he was directed to formally submit his request for a reasonable accommodation would not permit him to enter a request for a reasonable accommodation and requested that his legal counsel be able to confer with counsel for LBH to resolve this matter.

36. On March 30, 2022, Dr. Durand acquiesced to Dr. Kyere's suggestion and connected him to counsel for LBH, Jennifer Cohen, Esq.

37. On April 1, 2022, counsel for LBH informed Dr. Kyere's attorneys that LBH would grant his request for a reduced work schedule effective immediately and would pay him his full salary until a formal amended employment agreement evidencing the reduced work schedule could be ratified between the parties. Further, counsel for LBH indicated Dr. Durand would email Dr. Kyere to memorialize the new schedule.

38. In lieu of receiving an email from Dr. Durand memorializing this information, Dr. Durand texted Dr. Kyere to arrange a telephone call that evening. During the call, Dr. Durand confirmed Dr. Kyere's request for a modified work schedule was granted and was to begin effective immediately.

39. Dr. Durand also informed Dr. Kyere that a lead ultrasound technician reported she observed Dr. Kyere having dexterity issues during a procedure. Dr. Durand would not divulge to Dr. Kyere when the complaint was made, the date of the procedure, whether the patient suffered an adverse event or any harm, whether the procedure was performed properly or completed successfully, or any other details of the "report" or the procedure in question.

40. Much later, Dr. Kyere would learn this "report" by the lead ultrasound technician was never memorialized in writing but was made on March 3, 2022. On information and belief, this "report" by the lead ultrasound technician was solely related to subjective observation of Dr. Kyere's physical limitations and not related to any adverse patient safety event or his inability to perform a procedure.

41. Based on this report from the ultrasound technician, Dr. Durand stated he consulted with legal counsel and hospital leadership and there was a consensus to retain an independent Interventional Radiologist not affiliated with the hospital to observe Dr. Kyere performing procedures to ensure Dr. Kyere was not a threat to patient safety.

42. Dr. Durand also explained that the decision to make Dr. Kyere undergo an observation was also informed by a previous report from a staff member at Northwest Hospital in December 2020 and a report from Occupational Health in July 2021 that Dr. Kyere "seemed off."

43. Dr. Kyere was informed and questioned about these prior reports, all of which were related to subjective observations of Dr. Kyere's gait.

44. Prior to Dr. Kyere making a request for a reasonable accommodation, these "reports" were never deemed a patient safety risk, or formally investigated, but were dismissed because all reliable and objective evidence, such as Dr. Kyere's reputation among his peers, his ability to perform complex procedures, and his almost nonexistent complication rate, indicated Dr. Kyere was a capable and competent clinician who had a health condition which manifested as an abnormal gait.

45. It was only after Dr. Kyere engaged in a protected activity by requesting and obtaining a reasonable accommodation effective April 1, 2022, that these subjective prior observations of his gait became an indication to LBH that he may be a threat to patient safety which required a thorough investigation.

46. After Dr. Durand informed Dr. Kyere of LBH's intent to subject him to an observation, Dr. Kyere told Dr. Durand that he could not consent to such an observation without consulting with his attorneys.

47. On March 25, 2022, while Dr. Durand was attempting to thwart Dr. Kyere's efforts to obtain a reasonable accommodation, and to bolster the "report" from the lead ultrasound technician, LBH held a meeting with Dr. Kyere's staff to inquire about whether they had any information tending to prove he was a patient safety risk. Two Interventional Radiology technicians, Mark Fishel and Tarija Glenn, who scrub into every procedure with Dr. Kyere to provide assistance to him during procedures, both stated they had no concerns about Dr. Kyere being a patient safety risk.

48. Representations made by Mr. Fishel and Ms. Glenn during this meeting unequivocally refute the single unwritten report from the ultrasound technician. Nonetheless, the "report" from the ultrasound technician was articulated as the basis for a wide-ranging and unlawful investigation into Dr. Kyere's health by LBH.

49. On April 19, 2022, Dr. Kyere's attorneys wrote a detailed letter to LBH explaining that taking any employment action based on such information was unlawful. Such warnings, however, were entirely ignored by LBH as LBH made clear that Dr. Kyere would either consent to an observation or LBH would take some other action evidencing LBH's willful disregard of Dr. Kyere's right to be free from unlawful employment discrimination motivated by his disability.

50. Despite the hospital's purported serious concerns about patient safety after the March 3, 2022 "report" by the ultrasound technician, Dr. Kyere's clinical privileges were never restricted or revoked and Dr. Kyere was permitted to perform more than 200 procedures until he was constructively discharged from employment on September 15, 2022.

51. If LBH had *bona fide* concerns about patient safety relating to Dr. Kyere, his employment agreement, LBH's Medical Staff Bylaws, Impaired Practitioner Policy, and the Health Occupations Article of the Maryland Code all permitted LBH to summarily suspend Dr. Kyere's clinical privileges pending an investigation of Dr. Kyere's fitness to practice medicine.

52. LBH's failure to take any action to restrict Dr. Kyere's clinical privileges proves that there were no genuine concerns about Dr. Kyere's clinical competence or ability to provide safe patient care despite his disability.

53. LBH's lack of genuine concern about Dr. Kyere's ability to provide safe patient care is corroborated by objective evidence. In October 2021—just five months before Dr. Kyere requested a reasonable accommodation—Dr. Durand conducted a quality review of all physicians in the Department of Interventional Radiology and concluded that Dr. Kyere's complication rate was 0.1% over the prior two years, which Dr. Durand stated was the lowest complication rate he had ever seen. This quality review data was based on more than 5,500 interventional radiology procedures across all modalities Dr. Kyere had performed while employed by LBH.

54. LBH also has never identified a single adverse patient safety event related to Dr. Kyere that would cause concern about Dr. Kyere's clinical abilities, competence, or ability to provide safe patient care.

55. Based on LBH's articulated basis for an observation, Dr. Kyere informed LBH he would not consent to an observation.

56. Dr. Kyere reminded LBH that the nature of his medical practice allows LBH to do a post hoc review of any procedure he has ever performed. Specifically, during every interventional radiology procedure, whether performed by Dr. Kyere or any other provider, images of the procedure are captured and stored in the patient's medical record. These images would show the technique Dr. Kyere used during each procedure, the way each procedure is performed, and even the duration of the procedure.

57. Reviewing images captured during every procedure which is stored in every patient medical record is the most effective means of assessing the skill and safety of any Interventional Radiologist. As Medical Director of the Department, Dr. Kyere often employed this as a means to monitor other physicians in the Department.

58. On June 23, 2022, during one such post hoc review, Dr. Kyere discovered the comparator physician had embolized the wrong splenic artery branch on a patient, resulting in significant patient harm. This is generally deemed to be an unacceptable and significant complication in the field. Dr. Kyere immediately notified Dr. Durand and Assistant Vice President of Imaging, Jennifer Dorrough.

59. Although Dr. Durand acknowledged the comparator fellow physician's incident was "extremely troubling," this comparator physician continued to provide coverage without any investigation or oversight from the Department.

60. This comparator physician also had had several serious adverse patient safety events including, but not limited to, permanently embolizing the wrong organ, creating an air embolus in the aorta during an outpatient lung biopsy procedure requiring the patient to be admitted to the Intensive Care Unit, and placing a percutaneous gastrostomy tube in the colon leading to injury to the colon and causing the patient to go into septic shock before the patient was transferred to hospice and died. The frequency, rarity, and seriousness of these complications would lead any hospital to question the physician's competency and fitness to practice medicine. LBH, however, opened no investigation concerning this physician and did not restrict or revoke this physician's privileges.

61. On April 8, 2022, LBH forwarded Dr. Kyere a copy of the Medical Staff Bylaws, but informed him "[t]here is no formal complaint process or policy for procturing [sic]" despite LBH's ongoing efforts to make Dr. Kyere undergo an "observation."

62. On the same day, LBH also informed Dr. Kyere that another option to address its contrived and purported concern about patient safety is to conduct a Focused Professional Practice Evaluation (FPPE) which would be "transparent to the Medial Staff and to the hospital's Board of Directors" but "[t]o avoid that level of exposure in this case, we would like to proceed with observation outside of the FPPE process." To that end, LBH stated that it had "been working to arrange for observation, to be performed by a provider employed by a related entity who also performs catheter-directed procedures," like Dr. Kyere, and that "[s]uch observation is anticipated to take place on April 22."

63. Additionally, LBH also intended to schedule an additional "independent observation" of Dr. Kyere that would take place the week of May 2, 2022. LBH intended to schedule not one but two observations of Dr. Kyere. It was LBH's position that while Dr. Kyere "must consent to the observation, it is not optional."

64. On April 15, 2022, LBH forwarded Dr. Kyere its "Impaired Practitioner Policy" which establishes the Impaired Practitioner Committee (hereinafter referred to as "IPC"). Per the Medical Staff Bylaws, "[t]his committee will carry out the activities outlined in the

8

Impaired Practitioner Policy to include matters of physical and mental health, and substance abuse of the Medical Staff."

65. The IPC is a medical review committee under the Health Occupations Article of the Maryland Code established by the medical staff which "[e]valuates the qualifications, competence, and performance of providers of health care" as well as "[e]valuates and acts on matters that relate to the discipline of any provider of health care." Md. Code Ann., Health Occ. § 1-401.

66. Per the policy, this IPC was established to "provide a process for identifying a practitioner whose ability to practice medicine with reasonable skill and safety is impaired due to a physical, psychiatric or emotional illness, notifying the appropriate person(s), and determining an appropriate response."

67. This policy also requires that "[w]henever a practitioner is suspected of being impaired or providing unsafe treatment resulting from impairment, a confidential report of the facts and practitioner behavior which led to such suspicion shall be made to the appropriate Department Chief ("Chief"). In turn, the Chief is required to "evaluate the credibility of the complaint, allegation or concern" and forward such report to the President of the Medical Staff "[i]f the concern appears to be valid, or if there has been more than one complaint regarding the same practitioner during any twelve month period."

68. In accordance with Maryland law, this policy further requires that "[a]ll reports of suspected impairment, the identity of the practitioner suspected to be impaired, proceedings and investigations relating thereto, and actions taken as a result of such reports, proceedings and investigations (with the exception of actions taken with respect to the practitioner's clinical privileges) *shall remain confidential* except as limited by law, ethical obligation, or when the safety of patients is threatened." (Emphasis added.)

69. Under Maryland law, the IPC is a medical review committee as the IPC was established to "[e]valuate[] the qualifications, competence, and performance of providers of health care." Md. Code Ann., Health Occ. § 1-401

70. LBH breached its own established policy, procedures, and bylaws with regard to investigating the potential "impairment" of a physician by scheduling an observation, and it had discussed Dr. Kyere's sensitive health information in a public forum not protected by Maryland law.

71. When LBH decided to ignore the protections afforded to physicians under its policies, procedures, bylaws, and Maryland law, it left all discourse concerning Dr. Kyere and his health condition open to any form of legal discovery, including medical malpractice suits.

72. LBH's conduct placed Dr. Kyere at risk of being reported to the Maryland Board of Physicians or the National Practitioner Data Bank as a mandatory observation such as the one proposed could be deemed a restriction on his medical privileges. Such a restriction of

9

Dr. Kyere's clinical privileges requires a reporting to relevant authorities under state and federal law.

73. When Dr. Kyere's counsel pointed out such restrictions would be subject to reporting to the Maryland Board of Physicians and the National Practitioner Data Bank, LBH advised that it did not intend to restrict Dr. Kyere's clinical privileges, proving it had no genuine concerns about Dr. Kyere's ability to provide safe patient care.

74. On April 19, 2022, Dr. Kyere informed LBH in writing that he would not agree to an observation and requested an "alternative resolution" to this contrived matter.

75. The next day, LBH informed Dr. Kyere that all scheduled observations had been cancelled. However, LBH stated that it takes "seriously our obligation to ensure patient safety and cannot ignore the credible concerns that have been brought to the attention of the Radiology Department's leadership," and, to that end, such "credible" concerns "will be shared with the President of the Medical Staff, pursuant to Sinai's Impaired Practitioner Policy."

76. In the meantime, LBH continued to retaliate against Dr. Kyere with respect to Dr. Kyere's schedule, duties, and other terms of employment.

77. After granting Dr. Kyere a modified work schedule, LBH forwarded Dr. Kyere an Amended Employment Agreement that should have been limited to memorializing his new compensation and paid time off in accordance with his modified work schedule.

78. Instead, the proposed Amended Employment Agreement unlawfully changed Dr. Kyere's "terms, conditions and privileges of employment" by precluding him from taking additional calls although his original employment agreement permitted him to do so; restricting him from moonlighting for American Radiology although the previous agreement permitted him to do so; and altering his clinical schedule with a mandatory start time thereby eliminating his previous autonomy over his schedule.

79. On May 17, 2022, Dr. Kyere informed LBH that although he "is agreeable to the changes to his compensation and PTO, he will not agree to the other changes proposed."

80. LBH's attempt to modify the terms and conditions of Dr. Kyere's employment not related to compensation or PTO, after he obtained a modified work schedule as a reasonable accommodation, was discriminatory and retaliatory.

81. On May 24, 2022, LBH agreed to "leave the opportunity for additional call as it exists in the underlying agreement" and "remove the 8:00am start time from the amendment."

82. Although the Amended Agreement stated, "the Hospital *no longer consents* to the moonlighting activity set forth in Subsection 4.J" of his original Employment Agreement, LBH's new position was that Dr. Kyere "was never provided such consent." (Emphasis added.) Therefore, LBH was unwilling to take out the amended terms pertaining to Dr. Kyere's moonlighting activities with American Radiology.

10

83. Based on LBH's position with regards to his moonlighting activities, Dr. Kyere never signed the Amended Employment Agreement.

84. After April 1, 2022, the daily schedule, over which Dr. Kyere previously had complete autonomy prior to his request for a reasonable accommodation, was also now being changed without his knowledge or consent.

85. On April 8, 2022, just seven days after Dr. Kyere's reasonable accommodation was approved, Dr. Kyere received a text message from Dr. Durand stating "[p]er the schedule, which I have approved, you need to report to Northwest on Monday."

86. Although Dr. Kyere's contract states that Dr. Kyere will provide call coverage at Northwest Hospital, such coverage was for evening and weekend call coverage and when the assigned Interventional Radiologist at Northwest Hospital was absent. At the time, Dr. Kyere could not even recall the last time he had been asked to report to Northwest Hospital for day coverage.

87. In a subsequent telephone conversation, Dr. Durand explained that Dr. Kyere was being assigned to Northwest so that the Interventional Radiologist at Northwest can be trained at Sinai Hospital in cerebral angiograms and stroke therapy.

88. This contrived reason, however, was pretextual. Dr. Durand never explained why that physician could not come to Sinai for such training on days Dr. Kyere was scheduled off due to his new modified schedule. Dr. Durand knew Northwest Hospital was a much less desirable assignment for Dr. Kyere as Northwest Hospital had less complex patient cases, a smaller Interventional Radiology suite, and less sophisticated equipment with which to perform procedures.

89. During the early morning hours of April 18, 2022, Dr. Kyere received an amended schedule with changes he had not reviewed or approved. Again, Dr. Kyere was asked to report to Northwest Hospital. Dr. Kyere texted Dr. Durand to inquire why the change was made.

90. Dr. Durand indicated Dr. Kyere was being assigned to Northwest for his previously articulated reason—to allow the Northwest Interventional Radiologist to be trained in cerebral angiograms and stroke therapy at Sinai Hospital. When Dr. Kyere inquired why the physician could not do that training at Sinai on days he was scheduled off per his new modified schedule, Dr. Durand did not answer the question.

91. Realizing there was no credible answer to justify Dr. Kyere's Northwest Hospital assignment, Dr. Durand stated "[a]s usual I would say the answer is to run the service as you see fit on any given day" and it was agreed Dr. Kyere would work with the scheduler to prevent future changes to the schedule without his knowledge or consent.

92. Dr. Durand then began having Dr. Kyere scheduled to provide diagnostic coverage in lieu of interventional radiology coverage even though Dr. Kyere was hired as the Medical

11

Director for Interventional Radiology and his employment contract did not outline any diagnostic radiology responsibilities.

93. Prior to Dr. Kyere's modified work schedule, he almost never provided diagnostic coverage and such coverage was limited to days there was an emergency or a shortage of diagnostic radiologists due to a holiday. In any event, Dr. Kyere had never been required to provide diagnostic coverage without giving his consent.

94. After obtaining his modified work schedule, scheduling Dr. Kyere for diagnostic coverage became much more frequent, and even regular.

95. During a meeting to discuss scheduling with Ms. Dorrough, Dr. Kyere was informed that he had been scheduled to provide diagnostic coverage per Dr. Durand's instructions. Dr. Durand gave these instructions without discussing it with Dr. Kyere or obtaining his consent.

96. LBH's attempts to relegate Dr. Kyere to Northwest Hospital and then to diagnostic coverage were retaliatory.

97. Dr. Kyere was often scheduled to provide diagnostic coverage while LBH paid for IR locums coverage,[1] which was not economical, as locums physicians are paid two to three times Dr. Kyere's salary to provide coverage. Dr. Kyere was also being asked to provide diagnostic coverage even though there was already adequate diagnostic coverage onsite.

98. On April 25, 2022, Dr. Kyere put these concerns into an email to Dr. Durand. In his reply, Dr. Durand explained that "[d]iagnostic staffing has been short and we have a glut of coverage for a variety of reasons."

99. On April 29, 2022, as the Medical Director for the Department, Dr. Kyere had a meeting to discuss department scheduling with Ms. Dorrough and scheduler Jiselle Gladden. During the meeting, Dr. Kyere asked Ms. Dorrough and Ms. Gladden not to schedule him for diagnostic coverage. Dr. Kyere also instructed them that no IR locums coverage should be scheduled when Dr. Kyere is on site as it is extremely costly for the hospital. Additionally, Dr. Kyere asked them to schedule his days off on Tuesdays and Thursdays as much as practicable so that he could schedule his Physical Therapy appointments consistently.

100. Dr. Kyere also informed them that locums IR coverage for call[2] was not necessary when Dr. Kyere is scheduled to take call even if he is scheduled off that day pursuant to his

---

[1] Locums coverage is coverage on an as-needed basis from providers who are credentialed at LBH facilities but are not employed on a full-time basis by LBH.

[2] In addition to daytime coverage, the department required evening and weekend call coverage for emergency procedures. Pursuant to Dr. Kyere's employment contract, he is required to provide weeknight and weekend call coverage one week per month. When Dr. Kyere obtained a modified work schedule, he did not ask LBH to modify his call responsibilities by obtaining locums IR call coverage, as this would be costly for the hospital.

modified work schedule. To avoid costly locums IR call coverage, Dr. Kyere made clear that he was willing to take evening call, even on days he was scheduled off.

101. All these requests were within Dr. Kyere's authority as the Department's Medical Director. After this meeting, LBH stopped scheduling locums IR coverage for weeks Dr. Kyere was taking overnight and weekend call.

102. On May 6, 2022, Dr. Kyere had a leadership meeting with Dr. Durand and Ms. Dorrough to address these scheduling issues. At this meeting, Dr. Durand referred to Dr. Kyere as "selfish," characterized Dr. Kyere's previous meetings with Ms. Dorrough and Ms. Gladden as "inappropriate," and referred to Dr. Kyere as an "obstructionist" who "can't be trusted."

103. On May 10, 2022, Dr. Kyere's attorney sent correspondence to LBH outlining these retaliatory events and incidents.

104. On May 12, 2022, after meeting with Dr. Durand and Ms. Dorrough, LBH sent an email to Dr. Kyere's attorneys stating he has been "scheduled for diagnostics because of the scheduling needs of the department." LBH represented that "[f]inding IR coverage in this staffing environment has required the department to commit a certain number of days per week to independent contractors" and that "[w]hen Dr. Kyere is covering diagnostics, we're still sending images off site for reading (i.e., we are not "adequately staffed").

105. LBH counsel later also explained that LBH had employment agreements with the IR doctors providing locums coverage which required LBH to give them a minimum number of shifts per week. According to LBH, without the requisite minimum number of shifts, neither physician would be willing to provide any coverage at all.

106. Based on such representations from LBH, Dr. Kyere contacted Drs. Robert Reyes and Victor Yu—the two locums doctors retained by LBH to provide locums IR coverage to accommodate his modified work schedule.

107. Both doctors relayed starkly identical information to Dr. Kyere: (1) they were both contacted by Kris Brown, Executive Assistant to Dr. Durand; (2) both doctors were asked to provide "as much coverage as possible"; (3) neither physician was told the coverage need was only two days per week; (4) neither doctor indicated they required a minimum number of shifts in order to provide any coverage; and (5) neither doctor has a written contract with the hospital requiring a minimum number of shifts.

108. This contradicted Dr. Durand's and Ms. Dorrough's express representations.

109. These facts also clearly evidence the retaliatory nature of LBH's requirement that Dr. Kyere provide diagnostic coverage. In lieu of minimizing highly costly locums/independent contractor IR coverage, Dr. Durand solicited such coverage and relegated Dr. Kyere to diagnostic responsibilities, despite Dr. Kyere's employment contract and objections to such assignments.

110. Dr. Durand was personally aware that Dr. Kyere left his prior employment and rejoined LBH in May 2021 because his prior employer needed diagnostic coverage from IR physicians and Dr. Kyere did not want diagnostic radiology responsibilities.

111. Even assuming Dr. Kyere was being relegated to diagnostic coverage because of some shortage of diagnostic radiology coverage, it would have been cheaper for LBH to obtain locums diagnostic coverage than locums interventional radiology coverage.

112. It was now unequivocally clear that Dr. Kyere's diagnostic coverage assignment had nothing to do with the "scheduling needs of the department" and everything to do with retaliating against Dr. Kyere for engaging in a protected activity by obtaining a modified schedule as a reasonable accommodation.

113. On May 16, 2022, Dr. Kyere's attorneys informed LBH that he "will not provide any additional diagnostic coverage effective immediately."

114. On May 24, 2022, without disputing any of the information that Dr. Kyere learned from Drs. Yu and Reyes, LBH replied insisting that Department "staffing is being arranged to support the business needs of the department" and that LBH did not "have an IR role available" for Dr. Kyere, despite his position as the Medical Director of the Department, "given current staffing arrangements."

115. LBH's solution to this contrived dilemma was that "if the business needs of the department on a particular day demonstrate a need for Dr. Kyere to provide diagnostic coverage and he does not wish to do so, he will be permitted to take paid leave, as we previously discussed."

116. Despite the purported "business needs of the department," LBH immediately stopped scheduling Dr. Kyere for diagnostic coverage without any further discussion.

117. On May 12, 2022, the retaliation continued when Dr. Kyere received a letter from Elizabeth Zadzielski, MD, MBA, Chair, Impaired Physician Committee. The letter informed Dr. Kyere that the IPC was "convened on May 6, 2022 to review and discuss concerns regarding progressive changes in gait and mobility that have been referred by Dr. Daniel Durand, Chairman Department of Radiology, to Dr. Omar Zalatimo, President of the Medical Staff per the Sinai Medical Staff Bylaws and IPC policy."

118. According to the letter, after review of "*[o]bservations* from within the Radiology Department and Employee Health, as well as recommendations from Dr. Miriam Alexander's workplace assessment conducted November 23, 2021," the Committee was requiring that Dr. Kyere undergo an "Employee Health Assessment, including random substance testing" and "Evaluation by the Aging Surgeon Program at Sinai Hospital." (Emphasis added.)

119. The IPC cited events from ten and six months prior, during which time Dr. Kyere performed hundreds of complex and invasive procedures without a single adverse patient

safety event, as a basis to initiate this inquiry into his health status and ability to perform procedures.

120. According to the Aging Surgeons Program's website, the program was "developed to offer a comprehensive, multidisciplinary, objective and confidential evaluation of physical and cognitive function for surgeons."

121. To undergo evaluation under this program, Dr. Kyere would be required to release five years of medical records and undergo a two-day, intensive medical examination which would include a general physical exam, hearing screen, neurology exam, physical/occupational evaluation, neuropsychology exam, and ophthalmological examination.

122. Enclosed with the letter from the IPC were also health forms Dr. Kyere was required to complete and submit no later than May 20, 2022.

123. These forms sought information not only about Dr. Kyere's health but his family's health, including parents and siblings. It required he disclose whether his parents were living or deceased, their highest level of education, whether they had learning disabilities, whether they had any neurological diseases such as Alzheimer's or Parkinson's disease, whether they suffered from any other diseases such as heart disease or diabetes, whether they suffered from any psychiatric illness or other conditions, such as intellectual disabilities or learning problems, or used illicit drugs or suffered from alcohol abuse.

124. With respect to Dr. Kyere's health, he was required to disclose any "medical problems that you had prior to the onset of your current condition" such as diabetes, heart disease, exposure to toxins, any hospitalizations, and Dr. Kyere's psychiatric history such as whether he had ever suffered from depressive or anxiety disorders, and whether he had ever had psychotherapy, counseling, or psychiatric care. He was also required to disclose whether he was "experiencing any problems" related to his "marriage/family," "financial/legal (e.g., are you currently involved in a personal injury or criminal legal case)," or "housekeeping/money management."

125. The Committee's request was directed by Dr. Durand as a retaliatory act and aimed at embarrassing and harassing Dr. Kyere and discovering any physical or mental limitations not relevant to his ability to safely perform the essential functions of his job.

126. Based on the letter from the IPC to Dr. Kyere dated May 12, 2022, the Committee convened to address Dr. Kyere's purported "progressive changes in gait and mobility."

127. Yet, the proposed health inquiries and extensive medical examination clearly exceeded any attempts to determine whether his gait or mobility and any purported issues with his dexterity were impacting his ability to safely perform the essential functions of his job.

128. Despite the lack of concerns or allegations relating to his cognitive abilities, the Committee proposed to subject Dr. Kyere to a sweeping medical examination which includes a

15

neurological and neuropsychological evaluation. Although there have never been any concerns about his ability to see or hear, the Committee proposed to have Dr. Kyere undergo a hearing and ophthalmological exam. The Committee also proposed having Dr. Kyere undergo a "general physical examination," presumably aimed at discovering any health issues Dr. Kyere may have, even ones not relevant to whether he can perform the essential functions of his job.

129. In a letter dated May 16, 2022, Dr. Kyere's attorneys quickly requested that LBH reconsider the proposed invasive, overly broad, and unlawful medical examination and requirement to complete attendant health forms.

130. Although the IPC's requests were overly broad and unlawful, Dr. Kyere submitted to a drug and alcohol screening test on May 13, 2022, just one day after receiving the IPC's request to undergo such testing, to dispel any insinuation that he had any substance use or abuse problems.

131. On May 24, 2022, the Committee stated it "was not willing to alter its requests, as it believes the information which will be gathered by the Aging Surgeon Program (a nationally recognized program) is necessary for them to make a determination *as to whether impairment exists*, as they are required by our Impaired Practitioner Policy, which is being utilized at Dr. Kyere's request." (Emphasis added.)

132. It was clear the Committee was not interested in whether Dr. Kyere could perform the essential functions of his job but in determining *"whether impairment exists"*—a retaliatory and unlawful endeavor to harass and embarrass Dr. Kyere by compelling him to undergo an invasive health exam.

133. The only relevant and lawful inquiry for the Committee was whether any purported "impairment" impacted Dr. Kyere's ability to perform the essential functions of his job.

134. Dr. Kyere did not have the option to resign during such an investigation, because a resignation under such circumstances would be immediately reportable to the Maryland Board of Physicians or the National Practitioner Data Bank as required by law.

135. Fearing a reporting to the Maryland Board of Physicians or the National Practitioner Data Bank, which could take years to resolve and compromise his ability to obtain new employment, Dr. Kyere attempted to negotiate with the LBH and the IPC by offering: (1) all medical records that pertain to lab and imaging studies taken during the past five years; (2) a letter from his treating neurologist stating she is aware of his job and that based on her medical judgment, Dr. Kyere could perform all the essential functions of his job with a reasonable accommodation; and (3) agreement to submit to portions of the Aging Surgeons Program pertaining to an evaluation of his dexterity and cognitive abilities—the only portions relevant to determining whether he could perform the essential functions of his job.

136. In an email dated June 3, 2022, without addressing Dr. Kyere's suggestions on the merits, LBH refused to retreat from its unlawful and retaliatory demands and instead demanded he undergo the medical examination by July 1, 2022.

137. On June 6, 2022, Dr. Kyere initiated the process to file a Charge of Discrimination with EEOC.

138. At this time, LBH represented that Dr. Kyere was "currently in breach of his employment agreement due to his repeated, willful refusal to comply with the reasonable request of the committee. Remedies for his failure to complete the requested evaluation by July 1, 2022 include termination of employment."

139. Knowing he would be reported to the Maryland Board of Physicians for being terminated during such an investigation—even if the investigation is baseless, discriminatory, and retaliatory—Dr. Kyere had no choice but to complete the health forms to begin the medical evaluation through the Aging Surgeons Program.

140. On June 12, 2022, Dr. Kyere completed portions of the health forms which, in his judgment, were adequate to assess his clinical competence and ability to perform the essential functions of his job and, to some extent, protected his right to be free from unlawful medical inquiries, and submitted them to S. Jasmine Demos, Clinical Program Coordinator for the Aging Surgeon Program.

141. On June 13, 2022, Ms. Demos requested Dr. Kyere "go over the forms and fill out any blank areas," and "indicate when I will be receiving your prior medical records of 5 years back including lab findings and LSpine. MRI you indicated had been completed in 12/21." She also informed Dr. Kyere that the health forms "are not elective but mandatory to be filled out by participating physician."

142. In addition to the health forms, LBH and IPC also wanted Dr. Kyere to sign a "Release Form" releasing the Hospital and the doctors and providers from "any and all grievances, claims, demands, debts, defenses, actions or cause of action, obligations, damages and liabilities whatsoever which she now has, or has had, known or unknown, whether the same be at law, in equity, or mixed, in any way arising from or relating to the services provided, and the reports generated, pursuant to the testing agreement between Sinai and the person or institution who contracted for the evaluation."

143. After Dr. Kyere refused to sign the sweeping Release Form, citing his belief that he already had claims against LBH and potentially the IPC members, there were no further requests from LBH, the IPC, or the Aging Surgeons Program to complete any health forms or schedule any medical evaluation.

144. On July 21, 2022, LBH agreed not to make Dr. Kyere undergo any medical evaluation through the Aging Surgeon Program. Instead, the IPC now proposed Dr. Kyere undergo a medical evaluation by a Neurologist and an Ophthalmologist and undergo a "functional capacity evaluation."

17

145. After months of being subjected to these retaliatory actions, Dr. Kyere was completely exhausted, and the stress of these events were taking a toll on his health, family, and general wellbeing.

146. Since April 1, 2022, Dr. Kyere had been working under heightened scrutiny and caution which was not good for Dr. Kyere or his patients. Dr. Kyere was treating each patient utilizing not only his medical and clinical judgment but also with consideration of the pending allegations against him. Dr. Kyere would frequently stay up each night contemplating each case he had done the day or even weeks before, wondering if LBH would use some clinical judgment he made to make further allegations about whether he was a threat to patient safety. Almost daily, he spent his evenings after work checking medical records and imaging to ensure there was no basis to make any allegations concerning his clinical competence or ability.

147. Meanwhile, Dr. Kyere watched the comparator physician, who was a real threat to patient safety, continue to practice without any oversight.

148. The new, and much more limited, request for medical evaluation was further proof that LBH and the IPC had no genuine concerns about Dr. Kyere's ability to provide safe patient care and the previously proposed medical evaluation was not only unwarranted and unnecessary but proposed without any legitimate basis and in bad faith.

149. LBH went from only requesting an observation to requesting an invasive, retaliatory, and unlawful two-day medical examination and production of his medical records for prior years to asking Dr. Kyere to be evaluated by a neurologist, ophthalmologist, and undergo a "functional capacity evaluation."

150. On August 1, 2022, Dr. Kyere's attorneys sent a final letter to LBH restating, yet again, his legal position, and requesting a meeting with LBH counsel to discuss "final resolution of this matter."

151. After receiving this letter, it was LBH's immediate position that the employment relationship had become irreparable, and it desired to terminate the employment relationship and begin immediately to advertise his position.

152. In follow-up discussion on August 2, 2022, Dr. Kyere's attorneys spoke to LBH counsel regarding final resolution of all issues. Dr. Kyere's attorneys conveyed the unhealthy working relationship between Dr. Kyere and Dr. Durand, the financial and emotional toll the past five months have had on Dr. Kyere as well as his family, and that he could no longer proceed under the status quo.

153. During this follow-up discussion, LBH reiterated that the employment relationship had become so "irreparable" that it sought to terminate Dr. Kyere's employment. LBH also conveyed that any separation agreement must include a release by Dr. Kyere of all claims against it and its employees and agents. LBH also stated its desire to advertise Dr. Kyere's position immediately.

154. During this conversation, Dr. Kyere's attorneys informed LBH that Dr. Kyere would consider a separation agreement if LBH was not willing to close the IPC investigation and permit him to complete the remainder term of his contract.

155. Dr. Kyere's employment contract did not permit LBH to terminate Dr. Kyere without cause.

156. On August 3, 2022, LBH inquired with Dr. Kyere's attorneys what "terms of separation" he would find acceptable.

157. Dr. Kyere's attorneys proposed several terms of separation for consideration by LBH: (1) close the IPC investigation and permit him to complete the remainder of his contract term; (2) close the IPC investigation and permit him to resign and pay him $600,000 for release of all claims against LBH and any of its employees or agents; or (3) close the IPC investigation and permit him to resign without any release of any claims against LBH or any of its employees or agents.

158. After considering Dr. Kyere's proposed terms for separation, LBH informed Dr. Kyere that it has elected to terminate Dr. Kyere for failure to undergo the overly broad and unlawful medical examination required by the IPC if he did not resign.

159. Under threat of termination and fearing he would be reported to the Maryland Board of Physicians and the National Practitioner Databank if he was terminated during the IPC investigation, Dr. Kyere negotiated a formal separation agreement where if he resigned, LBH would agree to close the IPC investigation and not report him to any licensing authority or the National Practitioner Databank for resigning during a peer review investigation. Such reporting is required under federal law and the Maryland Health Occupations Code.

160. Knowing there was absolutely no basis for the IPC investigation, that Dr. Kyere had not had a single adverse patient safety event despite performing thousands of procedures throughout his employment with LBH, that there was no objective evidence suggesting Dr. Kyere could not provide safe and effective patient care despite his disability, LBH entered into a quid pro quo agreement with Dr. Kyere whereby it would close the IPC investigation in order to allow Dr. Kyere to resign.

161. LBH's willingness to enter this quid pro quo agreement permitted Dr. Kyere to resign without being reported to the Maryland Board of Physicians or the National Practitioner Data Bank and preserve his career and professional reputation.

162. LBH was aware that the express terms of Dr. Kyere's employment agreement did not permit LBH to terminate him without cause. LBH also knew that Dr. Kyere's refusal to undergo the overly broad and unlawful medical examination proposed by the IPC was not a legitimate basis to terminate his contract. Based on this, LBH determined the only way to compel Dr. Kyere to resign is to enter into such a quid pro quo agreement whereby the

sham IPC investigation would be closed and Dr. Kyere would resign with assurance that he would not be reported to the Maryland Board of Physicians or the National Practitioner Data Bank.

163. Ultimately Dr. Kyere entered into a quid pro quo separation agreement which expressly provided that the IPC investigation was closed, Dr. Kyere would voluntarily resign his clinical privileges at Sinai Hospital without any right to appeal under the Medical Staff Bylaws, and there would be no reporting to the Maryland Board of Physicians or the National Practitioner Data Bank concerning the IPC investigation or his resignation.

164. This separation agreement did not require Dr. Kyere to release any claims against LBH or its employees and agents.

165. In accordance with the quid pro quo separation agreement, Dr. Kyere was constructively discharged from his employment effective September 15, 2022.

## COUNT 1: DISCRIMINATION BASED ON ACTUAL AND REGARDED AS DISABILITY

166. Plaintiff adopts and incorporates the foregoing paragraphs 1 through 165 as if fully set forth herein.

167. At all times relevant hereto, Dr. Kyere was a qualified individual with a disability.

168. Beginning in at least 2020, LBH was aware of Dr. Kyere's apparent disability as manifested by an abnormal gait.

169. Despite his disability, Dr. Kyere exhibited superior skill and expertise in his specialty as an Interventional Radiologist.

170. Throughout his employment with LBH, Dr. Kyere exceeded all legitimate expectations of his employer.

171. Prior to March 1, 2022, when Dr. Kyere made a formal request for a reasonable accommodation based on his disability, LBH had never taken any corrective action or other adverse employment action against Dr. Kyere. To the contrary, LBH was pleased with his performance, promoted him to various positions several times throughout his employment, and relied on his skills and expertise in the field of Interventional Radiology.

172. Prior to March 1, 2022, when Dr. Kyere made a formal request for a reasonable accommodation based on his disability, LBH had never questioned whether Dr. Kyere's health condition, which LBH was aware manifested as an abnormal gait for years, impacted his ability to provide safe and effective patient care.

20